**FILED**

Oct 15 2019, 7:33 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Randolph L. Seger
Brian W. Welch
Michael T. Griffiths
Bingham Greenebaum Doll LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
INDIANA UTILITY
REGULATORY COMMISSION

Curtis T. Hill, Jr.
Attorney General of Indiana
Aaron T. Craft
Deputy Attorney General
Indianapolis, Indiana


Beth E. Heline
General Counsel
Jeremy R. Comeau
Assistant General Counsel
Indiana Utility Regulatory
Commission
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE
INDIANA OFFICE OF UTILITY
CONSUMER COUNSELOR

William I. Fine
Daniel M. Le Vay
Scott C. Franson
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Hamilton Southeastern Utilities, Inc.,

*Appellant,*

v.

Indiana Utility Regulatory Commission, et al.,

*Appellees.*

October 15, 2019

Court of Appeals Case No. 19A-EX-632

Appeal from the Indiana Utility Regulatory Commission

The Honorable James F. Huston, Chairman

The Honorable David E. Ziegner, Sarah E. Freeman, Stefanie Krevda, and David L. Ober, Commissioners

The Honorable Carol Sparks Drake, Senior Administrative Law Judge

IURC Cause No. 44683

**Bailey, Judge.**

# Case Summary

Following a previous order of this Court remanding this case to the Indiana Utility Regulatory Commission ("Commission"), Hamilton Southeastern Utilities, Inc. ("HSE") appeals the February 20, 2019, Commission's order on remand in which the Commission disallowed both HSE's requested 3% increase in the hourly billing rate for its affiliate, Sanitary Management & Engineering Company, Inc. ("SAMCO"), and a 10% management fee for SAMCO.

We affirm.

# Issues

HSE raises five issues which we consolidate and restate as follows:

1. Whether the Commission's order on remand satisfies the Court of Appeals instructions to support its order with substantial evidence by either making additional findings supporting the Commission's decision to disallow HSE's requested 3% rate increase for SAMCO billing charges and 10% SAMCO management fee (collectively, "SAMCO-related expenses") or recalculating HSE's rate.

2. Whether the Commission exceeded its statutory authority when it ordered HSE to provide evidence of its affiliate's costs.

3. Whether the Commission improperly promulgated a rule in its order on remand.

# Facts and Procedural History

[4] HSE is a for-profit public utility that provides sewage collection and treatment services to customers in Hamilton County, Indiana. HSE relies upon its affiliate, SAMCO, to carry out all operation, maintenance, and engineering functions of HSE's sewage operations. SAMCO charges HSE pursuant to a utility services agreement ("affiliate contract"). HSE's officers and directors all own shares of SAMCO.

[5] As a public utility, HSE is subject to regulation by the Commission. In 2009, HSE sought approval from the Commission for a base rate increase. The Indiana Office of Utility Consumer Counselor ("OUCC"), a state agency tasked with representing the interests of consumers in utility matters,[1] argued against HSE's proposed rate increase based in part on the National Association of Regulatory Utility Commissioners ("NARUC") guidelines. In its 2010 order ("2010 Order"), the Commission approved an increase to HSE's revenues of 3.22% and a rate of return of 9.8%. The 2010 Order—which approved SAMCO-related expenses—was based on HSE's market study evidence indicating that SAMCO charged rates and markups that were at or below the

---

[1] *See* Ind. Code § 8-1-1.1-4.1 (powers and duties of OUCC).

regional market, and it did not rely upon the NARUC guidelines. The Commission found that SAMCO's total contract charge to HSE for the test year 2009 was $3,280,990.

[6] Due largely to aging equipment, HSE began to experience operational issues that resulted in spills and overflow. In 2013, a sewage overflow led the Indiana Department of Environmental Management ("IDEM") to issue a Notice of Violation to HSE. HSE and IDEM subsequently entered into an Agreed Order under which HSE was required to develop and implement additional maintenance and operations programs. The requirements of the Agreed Order significantly increased HSE's maintenance and operating costs and will continue to do so for the foreseeable future. SAMCO is carrying out the actions required in the Agreed Order, and SAMCO's resulting total contract charge to HSE in test year 2014 was over $5 million.[2]

[7] Because of the added expenses, HSE achieved an average rate of return of 1.9% between 2009 and 2015, even though the Commission had approved a 9.8% rate of return in the 2009-10 rate case. Therefore, on September 24, 2015, HSE filed a petition seeking authority from the Commission to increase its rates and charges. Specifically, HSE sought an across-the-board rate increase of 8.42% which included, in relevant part, a 3% increase in SAMCO's billing rate and a

---

[2] The $5,339,669 contract charge for test year 2014 did not include the 3% increase to SAMCO's hourly rates that SAMCO and HSE negotiated in 2015 and for which HSE sought Commission approval in this case.

10% management fee.[3] OUCC advocated for a 14.01% rate reduction for HSE. HSE ultimately reduced its rate increase request to 6.27%.

[8] On February 24, 2016, the Commission conducted an evidentiary hearing on HSE's petition and, on November 9, 2016, issued an order ("2016 Order") authorizing a rate increase of 1.17%. The 2016 Order noted that the NARUC guidelines call for affiliate pricing to be at market price or the fully allocated cost,[4] whichever is lower. Because HSE failed to demonstrate SAMCO's fully allocated costs, the 2016 Order disallowed a rate increase for the requested SAMCO-related expenses. The Commission reached that decision despite finding that "HSE presented evidence that shows SAMCO's rates are at or below the rates charged by other similar firms," and "the 10% management fee may be customary in the industry." App. Vol. II at 27. The Commission also ordered HSE to provide evidence regarding SAMCO's fully allocated costs in HSE's next rate case. *Id.*

[9] HSE appealed to this Court, and we held, in relevant part, that the Commission acted arbitrarily in excluding the SAMCO-related expenses from HSE's rate calculation because it "failed to explain its decision to now adhere to the standard advocated by NARUC that the test for reasonableness is the lower of fully allocated costs or prevailing market prices." *Hamilton Southeastern Utils.,*

---

[3] The management fee is 10%of the value of the material costs, and it does not include SAMCO's hourly rates. That is, it is 10% "over and above reimbursement of SAMCO's costs." App. Vol. V at 10.

[4] SAMCO's fully allocated cost would be its "cost of providing the service[s]" to HSE. App. Vol. V at 8.

*Inc. v. Ind. Util. Regulatory Comm'n*, 85 N.E.3d 612, 626 (Ind. Ct. App. 2017) ("*HSE I*"). We also dismissed the Commission as a party to the case. *Id*. HSE sought transfer, which our Supreme Court granted. On transfer, the Supreme Court held that the Commission was a proper party, reversed the Court of Appeals holding on the SAMCO-related expenses issue, and remanded the case to this Court "with instructions to permit the Commission an opportunity to brief the [SAMCO-related expenses] issue." *Hamilton Southeastern Utils., Inc. v. Ind. Util. Regulatory Comm'n*, 101 N.E.3d 229, 234 (Ind. 2018) ("*HSE II*").

On remand, following additional briefing by the Commission, this Court noted that, although HSE submitted "the same type of evidence" the Commission had found acceptable in the 2010 Order, this time the Commission applied the NARUC guidelines and found HSE's evidence insufficient "because it had not supplied information regarding SAMCO's fully allocated costs." *Hamilton Southeastern Utils., Inc. v. Ind. Util. Regulatory Comm'n*, 115 N.E.3d 512, 515 (Ind. Ct. App. 2010) ("*HSE III*"). We noted that

> [t]he Commission implicitly found that the NARUC guidelines were reasonable and applicable to HSE in this rate case, but it did not enter any specific findings regarding why it had reached this conclusion, and, thus, the Commission's order on this issue was not supported by substantial evidence, was not reasonable, and was arbitrary. … In addition, the Commission's findings shed no light on why it chose to apply the portion of the NARUC guidelines pertaining to fully allocated costs when the NARUC guidelines themselves provide that "[u]nder appropriate circumstances, prices could be based on incremental cost, or other pricing mechanisms as determined by the regulator."

*Id.* (citations omitted). Thus, we "again reverse[d] the Commission on the SAMCO expenses issue and remand[ed] for it to make additional findings to support its decision or for a recalculation of HSE's rate." *Id.*

On remand, the Commission articulated its understanding that, in *HSE III*, we had directed it to "more fully expound upon the findings supporting" its conclusion that the SAMCO-related expenses were disallowed and "the interplay between NARUC guidelines and [its] findings and conclusions" on the SAMCO-related expenses issue. Commission Order on Remand ("2019 Order"), App. Vol. V at 4, 5. Therefore, based on the same evidence submitted at the February 24, 2016, hearing, the Commission entered numerous additional findings regarding the SAMCO-related expenses and again concluded that HSE failed to demonstrate that those expenses were "reasonable, merited, or in the public interest." *Id.* at 8. The Commission also again ordered HSE to "offer evidence in its next rate case demonstrating the fully allocated cost of billings to HSE by an affiliate that HSE seeks to recover in its rates." *Id.* at 10.

HSE now appeals the 2019 Order. We will provide additional facts as necessary.

# Discussion and Decision

## Standard of Review

[13] Our legislature created the Commission "primarily as a factfinding body with the technical expertise to administer the regulatory scheme." *Citizens Action Coal. of Ind., Inc. v. S. Ind. Gas & Elec. Co.*, 120 N.E.3d 198, 207 (Ind. Ct. App. 2019) (citing *N. Ind. Pub. Serv. Co. v. U.S. Steel Corp.*, 907 N.E.2d 1012, 1015 (Ind. 2009)). The Commission is assigned the responsibility of ensuring that public utilities provide "constant, reliable, and efficient service to the citizens of Indiana," including reasonable rates. *Id.*; Ind. Code § 8-1-2-4. "Because the complicated process of ratemaking is a legislative rather than judicial function, it is more properly left to the experienced and expert opinion present in the Commission." *Citizens Action Coal. of Ind., Inc. v. N. Ind. Pub. Serv. Co.*, 76 N.E.3d 144, 151 (Ind. Ct. App. 2017) (internal quotations omitted).

[14] We review the Commission's orders using a multi-tiered standard. *S. Ind. Gas & Elec. Co.*, 120 N.E.3d at 207 (citing *U.S. Steel Corp.*, 907 N.E.2d at 1015). First, we determine whether there is substantial evidence in the record to support the Commission's findings of basic fact. *Id.* In doing so, we neither reweigh the evidence nor assess witness credibility, and we consider only the evidence favorable to the Commission's findings. *Id.* However, "the Commission's order is not binding if it lacks substantial evidence supporting the findings of the Commission or is unreasonable or arbitrary." *Id.*

At the second tier, "the [Commission's] order must contain specific findings on all the factual determinations material to its ultimate conclusions." *Id*. (citation and internal quotations omitted). If the subject at issue is within the Commission's area of expertise, the Commission "'enjoys wide discretion and its findings and decision will not be lightly overridden simply because we might reach a different decision on the same evidence.'" *Id*. (quoting *N. Ind. Pub. Serv. Co.*, 76 N.E.3d at 151; *see also L.S. Ayres & Co. v. Indianapolis Power & Light Co.*, 169 Ind. App. 652, 351 N.E.2d 814, 819-20 (1976) ("While the utility may incur any amount of operating expense it chooses, the Commission is invested with broad discretion to disallow for rate-making purposes any excessive or imprudent expenditures.")

In addition, "an agency action is always subject to review as contrary to law, but this constitutionally preserved review is limited to whether the Commission stayed within its jurisdiction and conformed to the statutory standards and legal principles involved in producing its decision, ruling, or order." *U.S. Steel Corp.*, 907 N.E.2d at 1016. "The entity challenging the Commission's decision has the burden of proof to show that the decision is contrary to law." *City of Fort Wayne, Ind. v. Util. Ctr.*, 840 N.E.2d 836, 839 (Ind. Ct. App. 2006).

## Commission Compliance with *HSE III* Order

In the 2010 Order, the Commission did not rely on NARUC guidelines that require evidence of both fully allocated costs and prevailing market prices; rather, the 2010 Order approved HSE's rate increase based solely on evidence

of prevailing market rates.  However, in the 2016 Order, the Commission changed its approach and applied the NARUC guidelines to deny HSE's requested rate increase and management fees for failure to provide evidence of both SAMCO's fully allocated costs and prevailing market rates.

[18]   As we noted in *HSE I*, an agency "'may change its prior policy and is not forever bound by precedent.'"  85 N.E.3d at 622 (quoting *Ind. Bell Tel. Co. v. Ind. Util. Regulatory Comm'n*, 810 N.E.2d 1179, 1186 (Ind. Ct. App. 2004), *trans. denied*)).  However, a necessary departure from precedent and flawed policy must be accompanied by an explanation.  *Ind. Bell*, 810 N.E.2d at 1186.  The Commission has a

> well established right to modify or even overrule an established precedent or approach.  Lodged deep within the bureaucratic heart of administrative procedure, however, is the equally essential proposition that, when an agency decides to reverse its course, it must provide an opinion or analysis indicating that the standard is being changed and not ignored, and assuring that it is faithful and not indifferent to the rule of law.

*Id*. (cleaned up)[5] (quoting *Cmty. Care Ctrs. v. Dep't of Pub. Welfare*, 523 N.E.2d 448, 450-51 (Ind. Ct. App. 1988)); *see also Off. of Util. Consumer Couns. v. Bd. of Dir. for Util. of Dep't of Pub. Util.*, 678 N.E.2d 1127, 1129 (Ind. Ct. App. 1997) (noting that, because "administrative agencies must follow some sort of

---

[5]  *See Cardosi v. State*, Case No. 18S-LW-181, 2019 WL 3713946, at *7 n.5 (Ind. Aug. 7, 2019) (explaining use of parenthetical "cleaned up").

ascertainable standard[,]" an agency must "either follow the precedents it has set, or change its rules and policies with appropriate explanation").[6]

[19]   In *HSE III*, we found that the Commission's 2016 Order deviated from the standard it had articulated in the 2010 Order by applying the NARUC guidelines to HSE's current rate case. 115 N.E.3d at 515. We held that, while the Commission is not prohibited from applying part or all of the NARUC guidelines, it must enter "specific findings regarding why" it reached the decision to do so. *Id*. Because the Commission had failed to provide such an explanation, we held that its order on the SAMCO-related fees was "not supported by substantial evidence, was not reasonable, and was arbitrary." *Id*. We reversed the Commission's decision on the SAMCO-related expenses and remanded for the Commission "*to make additional findings* to support its decision" regarding those expenses "or for a recalculation of HSE's rate." *Id*. (emphasis added).[7]

---

[6] Thus, HSE is incorrect when it contends that the Commission failed to provide an ascertainable standard because it did not give HSE "prior notice" or warning that it would apply the NARUC guidelines to the rate case at issue. HSE's Br. at 39. Rather, when the Commission decides it is inappropriate to follow its precedents, it must only provide a contemporaneous explanation for why this is so. *See Bd. of Dir. for Util.*, 678 N.E.2d at 1129; *see also S. Ind. Gas & Elec. Co.*, 120 N.E.3d at 210 ("An agency may change its course and is not forever bound by prior policy or precedent as long as it explains its reasons for doing so."). Moreover, a decision maker obviously cannot give "prior notice" or warning of what its decision will be in a particular case before the case has even been presented to it. Thus, it is unclear what "prior notice" or warning HSE believes the Commission must give, especially when HSE objects to the "notice" the Commission provided it in this case requiring that HSE's next rate case must include evidence of its affiliate's fully allocated costs. HSE's Br. at 25, 49.

[7] Thus, *HSE III* did not prohibit the Commission from making additional factual findings, as HSE asserts; just the opposite. 115 N.E.3d at 515. Moreover, *HSE III* did *not* hold, as HSE contends and/or implies, that the commission on remand (1) must conduct an additional evidentiary hearing or otherwise take additional

[20] Based on testimony presented by OUCC and HSE's own admissions, the Commission held that the NARUC guidelines apply to the SAMCO-related expenses,[8] and that HSE failed to provide evidence that those expenses were justified under the guidelines. The Commission explained that the NARUC guidelines now apply to HSE's requested 3% rate increase because circumstances surrounding the rates charged by SAMCO had so significantly changed since the 2010 rate case that those rates could no longer be justified with only evidence of "on-line market rates for consulting firms, which include a profit." App. Vol. V at 9. The Commission noted that the market evidence supplied by HSE "was simply a compilation of rates and contract information HSE found on-line for various engineering firms or obtained by personal contact with the organizations." *Id.* Such evidence did not take into account the dramatic increase in annual services SAMCO now provides for HSE. As HSE admitted through the testimony of its President, Kendall Cochran ("Cochran"), SAMCO would charge its clients different rates depending upon the size of a client. Yet, HSE's market evidence contained no information about what kind of rates the sample engineering companies would charge for clients as large as HSE.

---

evidence (Appellant's Br. at 21), (2) cannot use the NARUC guidelines (*Id.* at 29), or (3) must explain "how HSE had fair warning or notice" that the Commission would apply the NARUC guidelines (*Id.* at 42).

[8] The Commission incorrectly contends that it "did not apply the NARUC Guidelines" in its 2019 Order. Comm'n Br. at 29, 33. To the contrary, the 2019 Order clearly disallows the requested increases in SAMCO-related expenses because they were not appropriate "under the evidence or the NARUC guidelines." *Id.* at 9, 11. In so holding, the Commission points to both the insufficiency of HSE's market-rate evidence and its complete lack of fully allocated cost evidence. *Id.*

[21]     In addition, Cochran admitted that, since the large increase in HSE's operations services, a majority of SAMCO's employees now "utilize 100 percent of their time on HSE work." *Id*. at 6. However, the evidence demonstrated that "the billing rates for consulting firms typically include a major allowance for unbilled hours, marketing, idle time between projects, and overruns that cannot be billed." *Id*. at 9. The evidence regarding SAMCO, on the other hand, showed that SAMCO employees working for HSE had no such idle time or unbilled hours. Thus, the billing rates of the sample engineering companies in HSE's market evidence would be higher than the billing rate that would be applicable to SAMCO, which did not include any unbilled hours.[9]

[22]     The Commission found essentially that HSE's market evidence did not compare apples to apples; it found that the rates on the internet do not "equate to the rates any of the sample engineering firms identified in the 'market study' will charge a client like HSE if offered over $5 million in services annually, particularly if a majority of their staff can expend 100% of their time providing these services." *Id*. The Commission concluded that "[t]he amount HSE pays SAMCO annually … has become too large to permit on-line market rates for consulting firms, which include a profit, to justify rates to HSE that are other

---

[9] The Commission also pointed to evidence that HSE could perform the services in-house at a lower cost than that charged by SAMCO. HSE provided no evidence to the contrary; in fact, it admitted that it never did a cost/benefit analysis to determine whether it could provide the services at a lower cost or got bids from other entities that manage projects. *Id*. at 6-7. Regardless, the Commission noted that "it is HSE's decision whether to provide more services in-house" and held only that HSE must provide evidence establishing that the charges of any affiliate it chooses to use are the lower of prevailing market prices or fully allocated cost. *Id*. at 9.

than SAMCO'S fully allocated cost." [10]  *Id*.  Since HSE's market evidence was insufficient and it had supplied no evidence regarding SAMCO's fully allocated cost, the Commission held HSE had failed to show that its requested rates were reasonable and in the public interest.

[23]  Similarly, the Commission explained that changed circumstances also made HSE's market evidence insufficient to justify HSE's requested 10% increase for SAMCO's management fee.  Again, HSE's market evidence indicating that some engineering firms charge a management fee did not take into consideration whether those companies would charge such a fee to a client as large as HSE and/or to a client that would require most affiliate employees to be fully dedicated to the client's work.  HSE admitted through Cochran's testimony that "a utility with enough customers and enough opportunities to bill" might be able to negotiate not having a management fee, and there was evidence that some engineering companies did not charge such a fee.  *Id*. at 10.  Thus, the Commission concluded the evidence showed the 10% management fee is "not market driven or required, that it is more probable that an engineering firm with an opportunity to provide over $5 million annually in services will negotiate this fee."  *Id*. at 11.  And, since HSE also "provided no

---

[10]  That finding is not—as HSE claims—inconsistent with the Commission's finding in the 2016 Order that "HSE presented evidence that shows SAMCO's rates are at or below the rates charged by other similar firms."  App. Vol. II at 27.  Rather, the 2019 Order further explains that the other firms' rates which seem to be comparable in HSE's market evidence are actually not comparable because they do not account for the size of the client served or the lack of unbilled hours.  In any case, the Commission's earlier decision regarding the SAMCO-related expenses was reversed by this court in *HSE III*.  115 N.E.3d at 515.

evidence demonstrating SAMCO's [management fee] is cost based," the Commission concluded that "recovery of this fee, given the record, would afford an unwarranted premium to HSE's affiliate." *Id*. Thus, the Commission held HSE failed to provide evidence showing that the fee was justified under the NARUC guidelines. *Id*.

[24] In reaching its ultimate conclusions, the Commission noted the NARUC guidelines state: "The prevailing premise of these Guidelines is that allocation methods should not result in subsidization of non-regulated services or products by regulated entities unless authorized by the jurisdiction regulatory authority." *Id*. at 8. The guidelines further state that affiliate transaction pricing is based, in part, on the assumption that "affiliate transactions raise the concern of self-dealing where market forces do not necessarily drive prices." *Id*. Thus, the Commission noted that the standard articulated by the guidelines—i.e., that affiliate prices for services "should be at the lower of fully allocated cost or prevailing market prices"—is designed for a situation like the one presented in this case, where the evidence indicates an affiliate's prices for services include a profit, or an "unwarranted premium." *Id*. at 11. The Commission also noted the guideline standard is "consistent with prior Commission orders indicating that services and materials affiliates provide to utilities are to be at cost, with no profit to be made by the affiliated interest from the transaction." *Id.* (citing *Petition of L.M.H. Utils. Corp.*, Cause No. 43022, 2007 WL 2826620 (IURC March 22, 2007)).

The evidence was sufficient to support the Commission's decision that the NARUC guidelines should apply to the SAMCO-related expenses and that HSE failed to show the fees were justified under those guidelines.[11]  HSE's contentions to the contrary are requests that we reweigh the evidence, which we cannot do.  *S. Ind. Gas & Elec. Co.*, 120 N.E.3d at 207.  Furthermore, because the Commission explained why it decided that the NARUC guidelines apply to the SAMCO-related expenses and made specific findings pointing to evidence supporting that decision, it complied with our remand order in *HSE III*.  115 N.E.3d at 515.

## Commission's Statutory Authority

HSE asserts that the Commission "exceeded its statutory authority" when it required "HSE to produce records beyond SAMCO's 'joint or general expenses.'"  HSE's Br. at 43.  HSE errs on two counts.  First, the Commission made no such order; it simply stated that HSE must present evidence related to SAMCO's fully allocated cost, without elaborating on the precise type of documentation required and without requiring documentation relating to any client of SAMCO other than HSE.  App. Vol. V at 9.[12]

---

[11] Nor did HSE point to any evidence supporting its contention that the SAMCO-related expenses should be based on "incremental cost, or [an]other pricing mechanism," as allowed by the NARUC guidelines "under appropriate circumstances."  *Id*. at 8.  As the Commission found, HSE did not provide any evidence related to cost, incremental or otherwise.  *Id*.  And HSE does not indicate what "other pricing mechanism" would apply besides the prevailing market rate, for which the Commission found insufficient evidence.

[12] The only evidence to which HSE points in support of its contention is Exhibit Volume III at pages 80 and 329.  However, the documents contained therein refer only to discovery requests made by OUCC, not

[27] Second, the Commission acted fully within its statutory authority when it held that HSE must provide evidence of SAMCO's fully allocated costs to justify its requested rate increase now and in its next rate case. State law requires that the Commission insure that public utilities provide "constant, reliable, and efficient service to the citizens of Indiana," including reasonable rates. *S. Ind. Gas & Elec. Co.*, 120 N.E.3d at 207; Ind. Code § 8-1-2-4. To fulfill that purpose, the Commission is given statutory authority to "inspect the books, accounts, papers, records, and memoranda of any public utility." I.C. § 8-1-2-49(1); *see also* I.C. § 8-1-2-12 ("The commission shall prescribe the forms of all books, accounts, papers and records required to be kept, and every public utility is required to keep and render its books, accounts, papers and records accurately and faithfully in the manner and form prescribed by the commission and to comply with all directions of the commission relating to such books, accounts, papers and records."); IC § 8-1-2-18 ("The … commission shall have authority … to inspect and examine any and all books, accounts, papers, records and memoranda kept by such public utility."); I.C. § 8-1-2-26 ("Each public utility shall furnish to the commission *in such form and at such time as the commission shall require*, such accounts, reports, and information as will show … completely and in detail the entire operation of the public utility in furnishing the unit of its product or service for the public." (emphasis added)); I.C. § 8-1-2-48 ("The commission shall inquire into the management of the business of all public

documents required by the Commission. HSE's Br. at 42 (citing transcript of testimony of OUCC witness and OUCC's "Data Request Nos. 9.7 and 9.8 regarding access to SAMCO accounting records").

utilities, and shall keep itself informed as to the manner and method in which the same is conducted and shall have the right to obtain from any public utility all necessary information to enable the commission to perform its duties."); *U.S. Gypsum, Inc. v. Ind. Gas Co., Inc.*, 735 N.E.2d 790, 798 (Ind. 2000) (holding that, in setting rates, the Commission "must examine every aspect of the utility's operations and the economic environment in which the utility functions to ensure that the data it has received are representative of *operating conditions that will, or should, prevail in future years*" (emphasis added)).

[28] The Commission also has authority to access the financial statements of affiliates of utilities. Indiana law provides that the Commission

> shall have jurisdiction over affiliated interests having transactions, … with utility corporations …, to the extent of access to all accounts and records of joint or general expenses, any portion of which may be applicable to such transactions, and to the extent of authority to require such reports to be submitted by such affiliated interests, as the commission may prescribe.

I.C. § 8-1-2-49(2).

[29] The Commission's 2019 Order requiring evidence of SAMCO's fully allocated cost did not exceed its statutory authority.

## Rule Promulgation

[30] HSE maintains that the 2019 Order reflected an improper attempt to create an agency rule regarding the application of the NARUC guidelines, rather than an administrative adjudication. When agencies engage in rulemaking, they must

comply with the requirements of Indiana's Administrative Rules and Procedures Act (ARPA). I.C. § 4-22-2-13(a); *see also Ward v. Carter*, 90 N.E.3d 660, 662 (Ind. 2018), *cert. denied*, 139 S.Ct. 240 (2018). Indiana law defines a "rulemaking action" as "the process of formulating or adopting a rule," but specifically excludes "agency action" from that definition. I.C. § 4-22-2-13(c). "Agency action" is defined as including "[t]he whole or a part of an order." I.C. § 4-22-2-13(d) (referring to definition contained in I.C. § 4-21.5-1-4).

[31] Caselaw has further articulated the elements that make up an administrative "rule," as opposed to an administrative "order."

> Characteristics of a rule were enunciated in *Blinzinger v. Americana Healthcare Corp.*, 466 N.E.2d 1371 (Ind. Ct. App. 1984). In *Blinzinger*, we found that a rate fee directive adopted by the Indiana Department of Public Welfare [now Indiana Utility Regulatory Commission] was a rule because: (1) it was an agency statement of general applicability to a class; (2) it was applied prospectively to the class; (3) it was applied as though it had the effect of law; and (4) it affected the substantive rights of the class. *Id.* at 1375.

*Villegas v. Silverman*, 832 N.E.2d 598, 609 (Ind. Ct. App. 2005). On the other hand, an administrative adjudication is "'the administrative investigation, hearing, and determination of any agency of issues or cases applicable to particular parties.'" *Ind. Alcohol & Tobacco Comm'n v. Lebamoff Enter., Inc.*, 27 N.E.3d 802, 815 (Ind. Ct. App. 2015) (quoting *Blinzinger*, 466 N.E.2d at 1374)).

[32] Here, on remand, the Commission did not issue an administrative rule but rather an administrative order—as this Court directed it to do in *HSE III*. 115

N.E.3d at 515.  Despite HSE's repeated characterization of the order as one applying to a "class," it is apparent from the face of the 2019 Order that it applies only to HSE.  The order explicitly notes that the NARUC guidelines "are not binding upon the Commission" but explains in detail why those guidelines nevertheless apply in this particular case.  App. Vol. V at 9, 11.  Thus, the holding that HSE must comply with the NARUC guidelines by demonstrating that its requested rate increase was based on the lower of the prevailing market price or the fully allocated costs was not an agency statement "of general applicability to a class," nor was it applied prospectively to a "class."[13]  *Villegas*, 832 N.E.2d at 609; *cf. Ind.-Ky. Elec. Corp. v. Comm'n, Ind. Dep't of Env't Mgmt.*, 820 N.E.2d 771, 779-80 (Ind. Ct. App. 2005) (holding IDEM statement of policy was generally applicable and designed to have the effect of law and, therefore, invalid for failure to comply with the procedural requirements of ARPA).  The Commission did not improperly attempt to create a rule in its 2019 Order.[14]

---

[13]  HSE cites no authority or cogent reasoning for its unique argument that the Commission decision in this individual utility rate case must apply to all "similarly situated" non-party utilities in the State or else violate Indiana Code Section 8-1-2-68, which requires that the Commission "fix" any rates it finds to be "unjust, unreasonable, insufficient, or unjustly discriminatory."  Therefore, that argument is waived.  Ind. Appellate Rule 46(A)(8)(a).

[14]  Because the Commission issued an order rather than a rule, it was not required to provide "prior notice" of its decision or comply with other procedural requirements of ARPA that are applicable to administrative rulemaking.  *See* I.C. §§ 4-22-2-23 through -43.

# Conclusion

[33] The Commission sufficiently explained, and cited sufficient evidentiary support for, its decision that HSE must comply with the NARUC guidelines by providing evidence that its requested SAMCO-related expenses are based on the lower of prevailing market prices or fully allocated cost and that HSE failed to do so. Furthermore, the Commission acted within its statutory authority when it ordered HSE to provide evidence of SAMCO's cost data. And the Commission's 2019 Order was not an improper attempt to create an administrative agency rule.

[34] Affirmed.

Najam, J., and May, J., concur.